UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. CR410-224 |
| | ) | |
| MICHAEL WILLIAMS | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Indicted for possession of a loaded handgun by a convicted felon and possession with intent to distribute controlled substances, doc. 1, defendant Michael Williams moves to suppress the gun and drugs which form the basis of his prosecution. Docs. 17 & 21. The motion should be denied.

## I. BACKGROUND

On June 6, 2010, Savannah-Chatham Metropolitan Police Officer Samantha Stephens had just started her early morning patrol of Yamacraw Village, a Savannah housing project, when she noticed an unknown black male asleep in a chair on the front porch of Apartment 957. The open, 4' x 10' porch sat only five feet back from a common sidewalk. Because it was most unusual to see someone sleeping on the

porch of one of the row-house apartments, Officer Stephens stopped and exited her vehicle in order to speak with Williams. As she approached on the common sidewalk, but while still some ten to fifteen feet from the porch, Officer Stephens spotted a silver handgun lying between the feet of the sleeping man. After summoning and receiving backup, she stepped onto the porch, where she bent down next to Williams and secured the loaded gun. Then she awakened him and told him that she was detaining him so that she could ask him about the weapon.

Concerned for her safety, Stephens handcuffed Williams and led him to the front of her vehicle for questioning. There she asked him if he had identification. He motioned with his head toward his back pocket and said "go get it." She felt his right rear pocket and detected an object that had the characteristic "soft and hard" quality of drugs. She reached inside the pocket and removed a bag of marijuana. She then reached into his other pockets and found cocaine, crack cocaine, and cash. She could not recall if she found his ID, and her evidence log did not show that it was logged in. After Officer Stephens searched Williams, he began to beat his head against her patrol car's window.

Williams testified that he was temporarily staying at his sister's house and admitted that he was asleep on the porch. However, he denied having a gun between his feet and claimed that "to this day" he had never seen it. He insisted that he never gave Stephens permission to retrieve his ID, much less search him, and claimed that he tried to retrieve the ID himself but the handcuffs prevented him. He agrees that Stephens awakened and handcuffed him on his porch, so there is no dispute that he was detained as soon as she awakened him.

The Court did not find Williams to be a credible witness. Specifically, it disbelieves his testimony that he never gave the officer permission to retrieve his ID from his pocket.[1] Instead, the Court fully credits Officer Stephens's testimony on this point and accepts as accurate her recitation of the facts surrounding her encounter with Williams.

---

[1] Williams testimony that he had no knowledge of the gun found beneath his feet is also suspect, but the credibility of that statement is not relevant to the Fourth Amendment issue presented here, for as explained below, regardless of whether it was defendant's gun (and that is a question for the jury), an officer who spots a pistol lying at the feet of a man asleep on the porch of a public housing unit, immediately adjacent to a public sidewalk, is entitled to secure that unattended weapon no matter who owns it or who placed it there.

## II. ANALYSIS

Williams argues that the "evidence was found and [the drug charge] is based on the fruits of an illegal search and seizure as defined by the law of the United States and Georgia Constitutions."[2] Doc. 17 at 1. He elaborates:

> The warrantless intrusion onto the property, seizure of defendant, as well as the search and detention [by the police] was done absent any articulable, reasonable suspicion whatsoever to make such a search and the subsequent detention and arrest of Defendant was done absent probable cause to arrest, thus requiring suppression of any and all evidence obtained as a result of said illegal stop, detention, search, and arrest.

*Id.* at 2 ¶ 3. These arguments are meritless.

First, under well established precedent, the officer did not require probable cause or any level of suspicion in order to approach the apartment for the purpose of speaking with the defendant. The Fourth Amendment is not implicated simply because an officer decides to approach a citizen in a public place and ask him some questions. *Florida*

---

[2] The Georgia Constitution is not relevant here. *United States v. Mastrangelo*, 733 F.2d 793, 799 (11th Cir. 1984) ("The admissibility of evidence in a federal prosecution is governed by federal law, rather than state law); *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994) ("The fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.").

*v. Royer*, 460 U.S. 491, 497 (1983); *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "A police officer may approach an individual in a public place, identify himself as a law enforcement officer and, in a non-coercive manner, ask the individual a few questions . . . ." *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1507 (11th Cir. 1986). And an individual who exposes himself to public view on the front porch of his residence is in a "public place" for Fourth Amendment purposes. *See United States v. Santana*, 427 U.S. 38, 42 (1976) (defendant standing in doorway of her home was in a "public place" for purposes of Fourth Amendment analysis); *United States v. Larson*, 63 F. App'x 416, 424 (10th Cir. 2003). Indeed, an officer may approach the principal entranceway of any residence for the purpose of knocking on the front door and speaking to the occupant provided he "embarks only upon places visitors could be expected to go." *United States v. Titemore*, 437 F.3d 251, 260 (2nd Cir. 2006) (while defendant's porch was part of the "curtilage" of his home, because the porch was not enclosed and provided the principal means of entrance, officer could lawfully enter onto porch in an effort to speak with defendant); *Larson*, 63 F. App'x at 424

(officer's entry onto front porch of residence for the purpose of knocking on the front door did not infringe the Fourth Amendment).[3]

Before Officer Stephens reached defendant to speak with him, she spotted a handgun lying at his feet. This observation naturally placed the officer in a heightened state of alert and changed the nature of her interest in the sleeping man. Firearms lying unattended in plain view on the porch of a public housing unit and in close proximity to a public sidewalk present a clear threat not only to the approaching officer but also to the community generally, for any passerby -- including a small child -- could easily retrieve the loaded weapon. The opportunity for great mischief was readily apparent to Officer Stephens, who knew that

---

[3] As one Court aptly put it:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal *per se*, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof -- whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964).

many small children lived in Yamacraw Village.[4] The Supreme Court has recognized that law enforcement officers are not only permitted, but expected, to exercise "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *Terry v. Ohio*, 392 U.S. 1, 13 (1968) ("Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime."). Here, the obvious danger to community welfare posed by a pistol lying unattended and exposed to public view in a public housing complex justified the exercise of just such a caretaking function. Thus, Officer Stephens did not offend the Fourth Amendment by stepping onto the porch to secure the weapon.

Once she had retrieved the handgun, Officer Stephens awakened defendant and placed him in handcuffs before questioning him about the weapon. This was also a perfectly legitimate response under these circumstances, for the officer had a good basis for fearing that the defendant posed a danger to her safety. Clearly, the officer was justified

---

[4] Indeed, defendant testified that his sister, the lawful resident of the apartment, had children living with her.

in waking defendant and detaining him momentarily in order to ask him some questions about the firearm. Stephens testified that it was not a "normal occurrence" to see someone asleep on the front porch of a Yamacraw Village housing unit[5] and that observation alone prompted her to stop her police vehicle and approach defendant. Once she spotted the gun lying unattended at the feet of the sleeping man, the officer's interest was elevated to a reasonable suspicion that defendant was up to no good, for responsible citizens simply do not leave firearms unattended and in plain view near a public sidewalk. This highly unusual and suspicious circumstance cried out for prompt investigation, and the Fourth Amendment -- which condemns only "unreasonable" police seizures -- was not violated by a brief investigatory seizure to determine why there was a gun at the defendant's feet, who owned that gun, and whether defendant was in lawful possession of the weapon. Thus, entirely independent of any community caretaking function, the officer

---

[5] Many prior cases in this Court have established that Yamacraw Village, like other public housing facilities in downtown Savannah, is a high crime area where drug activity and the unlawful possession and use of firearms is commonplace.

was entitled to briefly detain defendant to investigate her suspicion that defendant possessed this weapon unlawfully.

But even if the officer lacked the necessary reasonable suspicion to detain defendant for investigatory purposes, she nonetheless did not infringe the Fourth Amendment by placing him in handcuffs momentarily as a legitimate safety measure. It is well settled in this circuit that a *Terry* stop and frisk are "separate activities which serve distinct functions and require distinct justifications." *United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987). A frisk, unlike a stop, does not necessarily depend upon "an officer's focused investigation into a potential crime" but is appropriate whenever an officer encounters an individual that he reasonably believes to be a danger to his safety or that of others. *Id*. "In sum, a stop serves to investigate crime, while a frisk serves to prevent injury." *Id*. Thus, even when an officer encounters an individual that he does not suspect of any criminal activity whatsoever, the officer is entitled to frisk that individual for weapons if the officer reasonably believes the individual is armed and presently dangerous. *Id*. (upholding the frisk of an individual who arrived at an apartment where officers were executing a search warrant even though officers had

neither probable cause nor reasonable suspicion to detain the individual for investigatory purposes).

There is no requirement that an officer "be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002). Here, despite the fact that Officer Stephens had already seized and secured the firearm from between defendant's feet, she was certainly justified in the belief that he continued to pose a danger to her safety. A sleeping man who has a pistol lying at his feet may very well have another weapon concealed on his person. This was certainly a reasonable inference for the officer to make under the circumstances presented here. Defendant's strange conduct naturally gave rise to legitimate safety concerns by the officers. In other contexts, the Supreme Court has recognized that police officers are exposed to "inordinate risks" during routine traffic stops, even when they have no reason to believe that the driver is armed and dangerous. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977); *Maryland v. Wilson*, 519 U.S. 408, 412 & n. 1, 415 (1977) (because of the dangers inherent in

every traffic stop, officers may "as a matter of course" take the precautionary step of ordering not only the driver but also any passengers out of the vehicle). The danger inherent in any routine traffic stop is magnified greatly here, where the officer approached a sleeping man with a visible firearm lying within ready reach. Quite simply, Officer Stephens was not required to assume that there was no other weapon available to defendant once she secured the weapon from the porch. She also had a reasonable fear that any such concealed weapon presented a danger to the officers. A safety frisk, therefore, was entirely justified here.

Before conducting the frisk, Officer Stephens handcuffed defendant as an additional security measure. This, too, was a permissible response under the circumstances, for while some officers may have frisked defendant without first handcuffing him, the Constitution does not mandate any particular safety measure over another. In fact, the Eleventh Circuit has recognized that during the course of a *Terry* stop officers may draw their firearms and handcuff a suspect before proceeding with their investigation. *United States v. Acosta*, 363 F.3d

1141, 1147 (11th Cir. 2004); *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). The discovery of one loaded firearm and the realistic possibility that another might be at hand justified handcuffing this defendant as a safety precaution.

Once defendant was cuffed and led off the porch, the officer asked if he had an ID before proceeding with the frisk. Defendant gestured toward his right rear pocket and invited the officer to "go get it." This constituted consent to search. But the officer did not need defendant's permission to proceed with a safety patdown under these circumstances. When the officer patted the indicated pocket, she detected an object that, in her experience, felt like drugs. She removed the item, confirmed that it was marijuana, and proceeded to conduct a thorough search of defendant's person, which led to the discovery of other contraband. Under the "plain feel" doctrine, no Fourth Amendment violation occurred here. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (during a *Terry* frisk, if an officer "feels an object whose contour or mass makes its identity immediately apparent" as contraband, he may seize it); *United States v. Yamba*, 506 F.3d 251, 260 (3rd Cir. 2007) (officer could

lawfully seize plastic bag in defendant's pocket containing a "soft, spongy-like substance" thought to be marijuana during *Terry* patdown).

## III. CONCLUSION

For the reasons stated, defendant's motion to suppress should be **DENIED.**

**SO REPORTED AND RECOMMENDED** this <u>12th</u> day of January, 2011.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT of GEORGIA